## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**JOSEPH C. ROSE,**
*an individual,*

   **Plaintiff,**

v.

**CAMELOT SI, LLC,**
*a corporation,*

   **Defendant.**

Jeffrey Ellison (P35735)
Attorney for Plaintiff
214 S. Main Street, Suite 212
Ann Arbor, MI 48104
(734) 761-4300
(734) 528-4159 fax
EllisonEsq@aol.com

## COMPLAINT AND DEMAND FOR JURY TRIAL

There is no other pending or resolved civil action
arising out of the transaction or occurrence
alleged in the Complaint.

Plaintiff JOSEPH C. ROSE, through his attorney Jeffrey Ellison, after inquiry reasonable under

the circumstances, alleges the following:

1. This is an action by Plaintiff Joseph C. Rose against Defendant Camelot SI, LLC, d/b/a

   Sharper Image ("Sharper Image"), for discriminating and retaliating against Plaintiff in

   violation of the Americans with Disabilities Act, 42 USC §12101 *et seq.* ("ADA") and

   Title VII of the 1964 Civil Rights Act, 42 USC §2000e *et seq.* (Title VII), as well as

   Michigan's Persons With Disabilities Civil Rights Act, MCL 37.1101 *et seq.*

   ("PWDCRA"), and Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*

   ("ELCRA").  This action also seeks to remedy Defendant's violations of the Fair Labor

Standards Act, 29 USC §201 *et seq.* ("FLSA") and Michigan's wage and hour laws, MCL 408.361 *et seq.* and 408.411 *et seq.,* for wages and overtime Plaintiff earned that Defendant failed or refused to pay.

2. This Court has original jurisdiction over the subject matter of this Complaint pursuant to 28 USC §§1331 and 1343 and 29 USC §216.

3. This Court also has jurisdiction over Mr. Rose's state law claims set forth in this complaint pursuant to its supplemental jurisdiction to hear state law claims under 28 USC §1367(a). Both the federal and state claims alleged herein arose under a common nucleus of operative facts. The state action is so related to the federal claim that they form part of the same case or controversy, and the actions would ordinarily be expected to be tried in one judicial proceeding.

4. Venue is proper in this Court pursuant to 28 USC §1391(b)(2) because 1) Mr. Rose resides in this District, 2) Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction at the time this action is commenced, and 3) the acts and omissions giving rise to this Complaint occurred within this District.

## PROCEDURAL REQUIREMENTS

5. Plaintiff timely filed an administrative complaint with the United States Equal Employment Opportunity Commission and the Michigan Department of Civil Rights in which he alleged the statutory violations asserted herein. The complaint, EEOC Charge No. 471-2018-02439, was filed on June 18, 2018 and alleged discrimination and retaliation on account of disability.

2

6.  On October 23, 2018, the EEOC mailed Notice of Right to Sue on Charge No. 471-2018-02439 so that Mr. Rose could pursue his claims before this Court.  See Ex. 1.  Mr. Rose received the Notice of Right to Sue on October 25, 2018.

## FACTUAL ALLEGATIONS

7.  Defendant Camelot SI, LLC operates Sharper Image ("Sharper Image"), an American brand that offers for sale consumer home electronics, air purifiers, gifts, and other high-tech lifestyle products through its website, catalog, and third-party retailers.

8.  Joseph Rose commenced working for Sharper Image as Inventory Control Specialist in June 2017.  At the time he commenced such work, Mr. Rose was the employee of an employment agency that contracted with Sharper Image to supply staff for its warehouse operation.  After he completed 90 days of service with Sharper Image as an agency employee, Mr. Rose was hired in September 2017 directly by Sharper Image in the same job title and with the same duties he previously performed for Sharper Image as an employee of the employment agency.

9.  The duties of Mr. Rose's position required him to do the following tasks:

   ▪ Catalog and count inventory, using guidelines established by the employer;

   ▪ Implement the employer's program for refurbishing of merchandise returned by customers for eventual resale;

   ▪ Insure that returned merchandise that was considered saleable was separated from returned merchandise that was considered non-saleable, in accordance with guidelines established by the employer;

   ▪ Prepare inventory reports for the employer's Chief Executive Officer, Lance Reese;

   ▪ Conduct daily cycle counts of all inventory;

- Maintain daily counts and report those counts to the employer's Chief Executive Officer, Lance Reese, and its Operation Manager, Rebecca VanDemark;

- Insure that the merchandise listed for sale through the employer's website was actually available for sale, and report discrepancies to the employer's Copy Director;

- Report the job activities of Operations Manager VanDemark to CEO Reese;

- Respond to emails from various department heads concerning inventory;

- Assist the Warehouse Supervisor in improving his performance;

- Stage inventory for shipment, according to guidelines established by the employer;

- Carry out a reorganization of the warehouse, in accordance with a plan established by the employer.

10. The physical tasks Mr. Rose was required to perform were the following: type on a computer keyboard, use a telephone, walk short distances, stand and sit as necessary, and lift objects that weighed ten pounds or less. These tasks were well within the limitations established as the result of a spinal deficit he developed through service in the United States military, a physical limitation Defendant was aware of before Mr. Rose commenced working in the warehouse.

11. On a routine basis while Mr. Rose was employed by Defendant, he performed tasks of his job at home in the evening, preparing and completing spreadsheets related to inventory, and sending and receiving email with various officials of the employer, including CEO Reese. Managers and executives of the employer were aware that Mr. Rose performed these tasks after hours at his home, and they approved of him doing so. To access material and data that were needed in order to perform these tasks, Mr. Rose logged into the

employer's computer server remotely, using his unique username and password to do so. Mr. Rose routinely was not paid for the hours expended performing these tasks at home.

12. In his position as Inventory Control Specialist, Mr. Rose frequently heard warehouse employees use the N-word, a derogatory and offensive epithet used to denigrate African-Americans. Mr. Rose is African-American, although because of his light skin complexion, Mr. Rose's co-workers mistakenly believed him to be Caucasian. When Mr. Rose heard the N-word epithet used in the employer's warehouse, he voiced his objection to the person using it and reported its use to Operations Manager VanDemark.

13. On January 4, 2018, a semi-trailer of returned goods awaited unloading at the warehouse. This was a daily occurrence in the warehouse at this time of year. The warehouse that day was short-staffed because regular employees had failed to report for work. Because the work had to be done, Mr. Rose volunteered to assist another employee in the task, even though unloading a semi-trailer was not part of his job. During this work, a heavy box fell from the top of a stack of goods. Mr. Rose raised his hand to deflect the box from hitting him on the head. The box struck his hand and wrist, causing injury.

14. The same day he sustained the injury, Mr. Rose was examined at a clinic designated by the employer's workers' compensation insurer. The injury to Mr. Rose's hand and wrist was diagnosed as a bone bruise, and Mr. Rose was released to return to work immediately with no restriction. He was fitted with a hand and thumb brace to support the injured area, but the brace did not impede the movement of the joint in any substantial way.

15. Mr. Rose reported to worksite the same day as the injury, advised managers he was able to perform his job without restriction, and presented a medical release to this effect from the

clinic.  However, the managers did not permit him to return to work; instead, they sent him home for the day without permitting him to work.

16. Mr. Rose reported for work at his scheduled starting time the next morning, the day after the injury.  Although Mr. Rose was able to perform the essential functions of his job, with or without accommodation, Ms. VanDemark refused to permit Mr. Rose to resume work, citing the injury.  She sent him home until he was "100% healed" from the injury.

17. Mr. Rose continued to treat with care providers designated by the employer, who prescribed physical therapy and supportive brace for the injury and continued to state that Mr. Rose could perform his job without restriction.  After each physical therapy session, Mr. Rose went to the workplace to submit the medical release permitting him to work.  On each such occasion, the employer, through Operations Manager VanDemark, continued to refuse to permit Mr. Rose to return to work, citing the injury.

18. On January 18, 2018, Mr. Rose again was cleared to perform the essential functions of his job without restriction by the physician designated by the employer.  Again, Operations Manager VanDemark, on behalf of the employer, refused to allow him to return to work in an unrestricted capacity.  However, in contrast to previous actions refusing to permit him to return to work at all, Ms. VanDemark told Mr. Rose that he could return to his job on January 22, 2018 but was prohibited by the employer from working more than forty hours weekly.  Ms. VanDemark advised Mr. Rose that he would be disciplined if he worked more than forty hours in a workweek.  The reason Ms. VanDemark provided Mr. Rose for the forty hour restriction on his weekly work was his injury.

19. Mr. Rose returned to work on January 22, 2018, wearing the hand and thumb brace to support the injured area.  Neither the brace nor any other aspect of the injury interfered

with or prevented Mr. Rose from performing the essential functions of his job, with or without reasonable accommodation.

20. Prior to the January 4, 2018 incident involving the falling box in the semi-trailer, Mr. Rose and the rest of the warehouse staff routinely worked well in excess of forty hours weekly. The weeks surrounding the 2017-2018 holiday season required long workweeks from all warehouse staff, Mr. Rose included, and seventy hour workweeks for these staff members were not uncommon.

21. The injury Mr. Rose sustained on January 4, 2018 did not interfere with or impair his ability to perform the essential functions of his job as Inventory Control Specialist, with or without reasonable accommodation.  Thus, Mr. Rose continued to possess the physical abilities to type on a computer keyboard, use a telephone, walk short distances, stand and sit as necessary, and lift objects that weighed ten pounds or less.

22. Following the January 4, 2018 incident, Mr. Rose was denied all work for two weeks and all overtime work thereafter for the duration of his employment, despite the fact that the injury he sustained on January 4, 2018 did not interfere with his ability to perform the essential functions of his job as Inventory Control Specialist, with or without reasonable accommodation.

23. During a single workweek in February 2018, Mr. Rose worked 40 hours and 57 minutes. The time in excess of forty hours was incurred responding to emails from the employer's CEO, Lance Reese, among other tasks.  Mr. Rose was physically capable of performing the tasks that caused him to work more than forty hours during that workweek. Nonetheless, Ms. VanDemark issued a written reprimand to Mr. Rose on or about February

13, 2018 for violating the directive that he work no more than forty hours in a workweek while he remained under medical care for his work-related injury.

24. Had the January 4, 2018 incident not occurred and Mr. Rose not been injured, he would have worked well in excess of forty hours each workweek through the date he was discharged from employment, as dictated by the volume of work the warehouse was performing during that period.

25. When the employer permitted Mr. Rose to return to work, he continued to perform the same tasks as Inventory Control Specialist that he performed prior to the injury. In addition to these tasks, Mr. Rose was assigned duties involving the returns process for goods sent back by customers. He was able to perform the essential functions of these additional tasks fully, with or without reasonable accommodation, despite his injury.

26. During the period after Mr. Rose returned to work and until the time of his discharge, he was excused from work with pay for a portion of his scheduled workday one or more times per workweek in order to attend physical therapy and hand ortho therapy prescribed by the employer's workers' compensation medical care provider. During this period, Mr. Rose's supervisor expressed exasperation at the attendance "incidents" he was incurring in complying with the directive to attend physical therapy.

27. Around the same time Mr. Rose was disciplined for working more than forty hours in a workweek and his supervisor expressed exasperation for Mr. Rose attending physical therapy, Mr. Rose's co-workers learned that he is African-American.

28. In late February 2018, the employer created a new job title of Inventory Control Specialist Manager and promoted an employee Mr. Rose previously had supervised into the newly created position. The employee performed the same duties for which Mr. Rose was

responsible, although employee had a higher title than Mr. Rose's Inventory Control Specialist title.  The newly created Inventory Control Specialist Manager (ICSM) had no experience either in inventory control or in management and was otherwise less qualified than Mr. Rose.  Although the employee promoted into the ICSM position had previous warehouse experience with another employer, he was on information and belief discharged from that position because of a failed drug urinalysis test.  Mr. Rose was directed to and did train the employee promoted into the ICSM position in his duties.

29. On or about March 5, 2018, Mr. Rose's manager told Mr. Rose he believed Mr. Rose's injury and its consequences impeded Mr. Rose's productivity.  This statement was demonstrably false, as Mr. Rose was able to perform the essential functions of his job despite the injury, with or without reasonable accommodation.  The only limitation on Mr. Rose's ability to perform was the one imposed by the employer, that he not work more than forty hours in a workweek even though the volume of work to be performed routinely justified a longer workweek.

30. Approximately one week after the employer promoted an employee to the newly created position of Inventory Control Specialist Manager, the employer discharged Mr. Rose from employment.  The reason the employer provided to Mr. Rose for discharging him was "budget cuts."

31. On belief, the Inventory Control Specialist Manager has routinely worked in excess of forty hours weekly following Mr. Rose's discharge, work Mr. Rose was capable of performing notwithstanding his injury but was prevented doing by the employer's directive.

32. Except for a brief post-operative period, Mr. Rose's condition since the time of his discharge would not have impaired his ability to perform the essential functions of his job

as Inventory Control Specialist, with or without reasonable accommodation, had he not been discharged by the employer.

## COUNT I – VIOLATION OF AMERICANS WITH DISABILITIES ACT – DISCRIMINATION BASED ON DISABILITY

33. Mr. Rose incorporates by reference the allegations of paragraphs 1 through 32, above.

34. Mr. Rose has been diagnosed with and treated for a wrist injury sustained on January 4, 2018 and arising out of and in the course of his employment.  As treatment for it he has had a course of physical therapy and, since the time of his discharge, a ligament reconstruction and tendon interposition surgery.  A second surgery has been recommended.  The condition from which he suffers has extended longer than one year and is expected to be permanent.

35. Mr. Rose is an individual with a disability because he is substantially limited in the major life activity of, *inter alia,* use of his injured wrist and thumb, except for light duties such as typing on a keyboard, dialing a phone, and lifting items weighing less than ten pounds.

36. At all times relevant to this matter, Mr. Rose was able to perform the essential functions of his job, with or without reasonable accommodation.

37. Defendant is an employer within the meaning of the Act.

38. Defendant, its managers and employees subjected Mr. Rose to intentional discrimination on the basis of disability by refusing to permit him to perform his job 1) at all, during the two-and-one-half weeks following January 4, 2018, 2) beyond forty hours per week, at all times thereafter while he remained employed by the employer, and 3) by discharging him from employment.

39. Mr. Rose suffered damages as the result of Defendant's conduct.  He experienced loss of pay and benefits as the direct and proximate result of each of the three acts of discrimination

identified in the preceding paragraph of this complaint.   In addition, he suffered humiliation, psychological harm, emotional distress, physical symptoms, and damages arising from unlawful disability discrimination.

WHEREFORE, Mr. Rose respectfully requests that this Court provide the following relief, as permitted by law:

(a) A declaration that Defendant's policies, procedures, and practices have subjected Mr. Rose to discrimination in violation of Title I of the Americans with Disabilities Act;

(b) Compensatory damages;

(c) Equitable relief;

(d) Punitive damages;

(e) Reasonable attorneys' fees and costs;

(f) All other necessary and appropriate relief at law and equity.

## COUNT II – VIOLATION OF PERSONS WITH DISABILITIES CIVIL RIGHTS ACT – DISCRIMINATION BASED ON DISABILITY

40. Mr. Rose incorporates by reference the allegations of paragraphs 1 through 32, above.

41. The allegations made against Defendant in paragraphs 33 through 39 in Count I, above, constitute violations of the PWDCRA in this Count, for the same reasons they constitute violations of the ADA in Count I.

WHEREFORE, Mr. Rose respectfully requests that this Court provide the following relief, as permitted by law:

(a) A declaration that Defendant's policies, procedures, and practices have subjected Mr. Rose to discrimination in violation of the Persons With Disabilities Civil Rights Act;

(b) Compensatory damages;

(c) Equitable relief;

(d) Damages for emotional distress;

(e) Exemplary damages;

(f) Reasonable attorneys' fees and costs;

(g) All other necessary and appropriate relief at law and equity.

### COUNT III – VIOLATION OF AMERICANS WITH DISABILITIES ACT – REGARDED AS DISABLED

42. Mr. Rose realleges paragraphs 1 through 32 as if fully stated here.

43. Defendant, its managers and employees regarded Mr. Rose as being restricted in his ability to perform on account of injury, even though the employer's medical professionals deemed him able to work without restrictions and Mr. Rose presented himself as ready and able to perform the essential functions of his job, with or without reasonable accommodation.

44. Defendant willfully violated the ADA by regarding Mr. Rose as suffering from a disability that interfered with him performing the essential functions of his job when it did not so interfere, and by:

    (a) Prohibiting Mr. Rose from returning to work in any capacity from the period January 4, 2018 to January 22, 2018;

    (b) By permitting Mr. Rose to return to work on January 22, 2018 but prohibiting him from working more than forty hours weekly, and issuing discipline to him when he did;

    (c) By discharging Mr. Rose from employment.

45. As a direct and proximate result of these ADA violations, Mr. Rose has suffered damages in the same categories as identified in Count I, above.

WHEREFORE, Mr. Rose respectfully requests that this Court provide the following relief, as permitted by law:

12

(a) A declaration that Defendant's policies, procedures, and practices have subjected Mr. Rose to discrimination in violation of Title I of the Americans with Disabilities Act;

(b) Compensatory damages;

(c) Equitable relief;

(d) Damages for emotional distress;

(e) Punitive damages;

(f) Reasonable attorneys' fees and costs;

(g) All other necessary and appropriate relief at law and equity.

## COUNT IV – VIOLATION OF PERSONS WITH DISABILITIES CIVIL RIGHTS ACT – REGARDED AS DISABLED

46. Mr. Rose incorporates by reference the allegations of paragraphs 1 through 32, above.

47. The allegations made against Defendant in paragraphs 42 through 45 in Count III, above, constitute violations of the PWDCRA in this Count, for the same reasons they constitute violations of the ADA in Count III.

WHEREFORE, Mr. Rose respectfully requests that this Court provide the following relief, as permitted by law:

(a) A declaration that Defendant's policies, procedures, and practices have subjected Mr. Rose to discrimination in violation of Title I of the Persons With Disabilities Civil Rights Act;

(b) Compensatory damages;

(c) Equitable relief;

(d) Punitive damages;

(e) Reasonable attorneys' fees and costs;

(f) All other necessary and appropriate relief at law and equity.

### COUNT V – VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT – RACE DISCRIMINATION AND RETALIATION

48. Mr. Rose realleges paragraphs 1 through 32 as if fully stated here.

49. Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e *et seq.*, (Title VII) applied to Mr. Rose and Defendant during the events at issue in this Complaint.

50. Defendant, its officers and employees discriminated against Mr. Rose in violation of Title VII by subjecting him to hostile work environment in the form of pervasive use of racial epithets in the workplace.

51. Defendant's managers knew such conduct was occurring and took no steps to halt it.

52. Defendant discharged Mr. Rose from employment in retaliation for his complaint about the hostile work environment.

53. Such discrimination and retaliation violated Title VII.

WHEREFORE, Mr. Rose respectfully requests that this Court provide the following relief, as permitted by law:

(a) A declaration that Defendant's policies, procedures, and practices have subjected Mr. Rose to discrimination in violation of the Title VII;

(b) Compensatory damages;

(c) Equitable relief;

(d) Damages for emotional distress;

(e) Exemplary damages;

(f) Reasonable attorneys' fees and costs;

(g) All other necessary and appropriate relief at law and equity.

## COUNT VI – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT –
## RACE DISCRIMINATION AND RETALIATION

54. Mr. Rose realleges paragraphs 1 through 32 as if fully stated here.

55. The Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.* (ELCRA) applied to Mr. Rose and Defendant during the events at issue in this Complaint.

56. Defendant, its officers and employees discriminated against Mr. Rose in violation of ELCRA by subjecting him to hostile work environment in the form of pervasive use of racial epithets in the workplace.

57. Defendant's managers knew such conduct was occurring and took no steps to halt it.

58. Defendant discharged Mr. Rose from employment in retaliation for his complaint about the hostile work environment.

59. Such discrimination and retaliation violated ELCRA.

WHEREFORE, Mr. Rose respectfully requests that this Court provide the following relief, as permitted by law:

(a) A declaration that Defendant's policies, procedures, and practices have subjected Mr. Rose to discrimination in violation of the ELCRA;

(b) Compensatory damages;

(c) Equitable relief;

(d) Damages for emotional distress;

(e) Exemplary damages;

(f) Reasonable attorneys' fees and costs;

(g) All other necessary and appropriate relief at law and equity.

## COUNT VII – VIOLATION OF FAIR LABOR STANDARDS ACT

60. Mr. Rose realleges paragraphs 1 through 32 as if fully stated here.

61. The Fair Labor Standards Act, 29 U.S.C. 201 *et seq.*, applied to Mr. Rose and Defendant during the events at issue in this Complaint.

62. Mr. Rose was a non-exempt employee based on his duties.

63. Defendant was required to pay, and Mr. Rose was entitled to receive, one-and-one-half times his hourly rate of pay for all hours worked in excess of forty in a workweek.

64. Defendant suffered or permitted Mr. Rose to work hours in excess of forty in a workweek, including work at home in the evenings.  Further, Defendant was aware that Mr. Rose worked hours at home in the evenings and permitted and condoned such work.  However, Defendant did not pay compensation to Mr. Rose for all hours he performed in excess of forty in a workweek.

65. Defendant's practice of failing or refusing to pay Mr. Rose for overtime work was an intentional or willful violation of the Fair Labor Standards Act.

66. As a direct and proximate result of Defendant's actions described above, Mr. Rose has suffered loss of income and is entitled to compensation, liquidated damages, attorneys fees, and all available legal and equitable remedies.

WHEREFORE, Mr. Rose respectfully requests that this Court provide the following relief, as permitted by law:

     (a) All wages, salary, employment benefits, or other compensation, denied or lost by reason of the violation;

     (b) Interest;

     (c) Liquidated damages;

     (d) Attorneys fees; and

     (e) Other damages and remedies available under law.

## COUNT VIII – VIOLATION OF MICHIGAN'S WAGE AND HOUR LAWS

67. Mr. Rose realleges paragraphs 1 through 32 as if fully stated here.

68. Michigan's wage and hour laws, M.C.L. 408.361 *et seq.* and M.C.L. 408.411 *et seq.* applied to Mr. Rose and Defendant during the events at issue in this Complaint.

69. Defendant was required to pay, and Mr. Rose was entitled to receive, one-and-one-half times his hourly rate of pay for all hours worked in excess of forty in a workweek.

70. Defendant suffered or permitted Mr. Rose to work hours in excess of forty in a workweek, including work at home in the evenings.  Further, Defendant was aware that Mr. Rose worked hours at home in the evenings and permitted and condoned such work.  However, Defendant did not pay compensation to Mr. Rose for all hours he performed in excess of forty in a workweek.

71. Defendant's practice of failing or refusing to pay Mr. Rose for overtime work was an intentional or willful violation of Michigan's wage and hour laws.

72. As a direct and proximate result of Defendant's actions described above, Mr. Rose has suffered loss of income and is entitled to compensation, liquidated damages, attorneys fees, and all available legal and equitable remedies.

WHEREFORE, Mr. Rose respectfully requests that this Court provide the following relief, as permitted by law:

> (a) All wages, salary, employment benefits, or other compensation, denied or lost by reason of the violation;
>
> (b) Interest;
>
> (c) Liquidated damages;
>
> (d) Attorneys fees; and

(e) Other damages and remedies available under law.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues presented in this case.

Respectfully submitted,

JEFFREY J. ELLISON, PLLC

By: /s/ Jeffrey J. Ellison
Jeffrey Ellison (P35735)
Attorney for Plaintiff
214 S. Main Street, Suite 212
Ann Arbor, MI 48104
(734) 761-4300
(734) 528-4159 fax
EllisonEsq@aol.com

Dated: January 20, 2019

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Joseph C. Rose<br>6532 Brockhurst Blvd<br>West Bloomfield, MI 48322 | From: | Detroit Field Office<br>477 Michigan Avenue<br>Room 865<br>Detroit, MI 48226 |
|---|---|---|---|

☐  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 471-2018-02439 | Jamie S. Dickinson,<br>Investigator | (313) 226-5670 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA m**ust be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐  More than 180 days have passed since the filing of this charge.

☒  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

**Michelle Eisele,**
**District Director**

10·23·18
*(Date Mailed)*

cc:   Don Schooley - Human Resources Director
SHARPER IMAGE OWNED BY CAMELOT VENTURE GROUP
c/o James Hermon
Dykema Gossett PLLC
400 Renaissance Center
Detroit, MI 48243

Jeffrey J. Ellison
Law Offices of Jeffrey J. Ellison
214 South Main St., Suite 212
Ann Arbor, MI 48104-2122

Exhibit **1**